UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WAKIYAN DREAMER,<br><br>Defendant. | 5:25-CR-50109-CCT<br><br>REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION TO SUPPRESS (DOC. 30) |

Pending is Defendant's Motion to Suppress (Doc. 30). An evidentiary hearing was held on Wednesday, September 3, 2025. (Doc. 37). Defendant was personally present and represented by his attorney of record, Jennifer Albertson. Id. The Government was represented by Assistant United States Attorney Benjamin Schroeder. Id. Three witnesses testified at the hearing and one exhibit was received into evidence. (Id.; Doc. 39). Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be granted.

## JURISDICTION

Defendant is charged in a Superseding Indictment with Possession of a Firearm and Ammunition by a Prohibited Person in violation of 18 U.S.C. §§

1

922(g)(1) and 924(a)(8).  (Doc. 25).  The pending Motion was referred to the

Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and United States

District of South Dakota's local rule, LR 57.11.

## FACTUAL BACKGROUND

In May of 2025, the Criminal Investigations Division within the Rapid

City Police Department (hereinafter "RCPD") was conducting a firearm

investigation involving Wakiyan Dreamer and persons associated with him.

The investigation involved two shootings in Rapid City, South Dakota.  On May

14, 2025, RCPD Officer Parker Dadah[1] was notified that Mr. Dreamer was

believed to have some association with a crime and that detectives wanted to

speak with him.  After a briefing, Officer Dadah and other officers went to

search for Mr. Dreamer.  Wakiyan Dreamer was located exiting a house on the

200 block of East Nevada.  Officer Dadah admitted that Mr. Dreamer was not

actively committing a crime.  However, Officer Dadah was told by RCPD

detectives there was probable cause to arrest Mr. Dreamer.  Mr. Dreamer was

handcuffed, detained, and searched.  Officer Dadah testified that Mr. Dreamer

had a cell phone in his possession when he was arrested.

As part of the investigation, Detective Morgan Slanina[2] requested a

search warrant of Mr. Dreamer's cell phone.  (Ex. 1[3] at pp. 6–8).  Judge Joshua

Hendrickson, a State Court Circuit Judge, signed the search warrant on May

---

[1] Officer Dadah testified at the evidentiary hearing and the court finds his testimony credible.
[2] Detective Slanina testified at the evidentiary hearing and the court finds her testimony credible.
[3] Ex. 1 is the search warrant affidavit and the signed May 15, 2025, search warrant.

15, 2025.  Id. at p. 8.  According to Detective Slanina's search warrant affidavit, on May 12, 2025, RCPD officers were called to the Oxford Apartments in Rapid City, regarding a single gunshot.  Id. at p. 3.  A witness told officers that a male with long hair ran down the stairs after the gun shot was fired.  Id. According to the affidavit, the witness testified that the long-haired man left the scene in a gold Buick vehicle.  Id.  Officers located a 9mm shell casing at the scene.  Id.  Detective Slanina testified that she reviewed the police report of the Oxford Apartments shooting before writing the search warrant affidavit.

According to the search warrant affidavit, on May 13, 2025, RCPD officers were called to the Corner Pantry convenience store regarding another shooting.  Id.  Officers found a 9mm shell casing in the street next to the convenience store.  Id.  Dispatch was advised by the reporting party that the shooter was a Native American male with long hair and a red hat.  Id.  The man was last seen traveling toward the Oxford Apartments with another person.  Id. Detective Slanina told this court that she identified Mr. Dreamer in the Corner Pantry's surveillance footage.  Video footage showed that Mr. Dreamer went to the convenience store with three females.  Id.

Detective Slanina identified Shayna Long as a female who was with Mr. Dreamer after reviewing the convenience store's video footage and speaking with the store manager.  Id.  Detective Slanina confirmed Shayna Long's identity through previous booking photos.  Id.  After reviewing Shayna Long's RCPD records, Detective Slanina found Shayna Long was in a traffic stop with Wakiyan Dreamer.  Id.  Mr. Dreamer was driving a gold Buick LeSabre during

the traffic stop.  Id.  Detective Slanina reviewed booking photos of Mr. Dreamer and confirmed he was the male in the Corner Pantry's video footage based on multiple matching facial tattoos.  Id.  Detective Slanina testified that she reviewed the video footage before she wrote the search warrant affidavit.

According to Detective Slanina's affidavit, the full video footage at the Corner Pantry showed Mr. Dreamer, Shayna Long, and two unidentified females walk across Milwaukee Street from the Oxford Apartments to the Corner Pantry.  Id.  Mr. Dreamer and Shayna Long entered the store and made a purchase at the convenience store's register.  Id.  As Mr. Dreamer and Shayna Long left the convenience store, the video shows what appeared to be a verbal exchange between a group of people sitting in front of the store with Mr. Dreamer and Shayna Long.  Id. at p. 4.  Mr. Dreamer and Shayna Long walked away from the parking lot but continued to look over their shoulders.  Id.  As Mr. Dreamer and Shayna Long approached the sidewalk along Milwaukee Street, Mr. Dreamer pulled a firearm from his waistband and fired a round at the group standing in front of the Corner Pantry.  Id.  Mr. Dreamer then disappeared from the camera's view while Shayna Long ran to the Oxford Apartments parking lot.  Id.  The video footage showed the group of people ducking after the shots were fired.  Id.  The group did not leave until a store employee told them law enforcement would be called.  Id.  Detective Slanina's affidavit explains that officers were told that the group of people fled the scene to a house nearby the Corner Pantry.  Id.

Detective Slanina requested a complete criminal history of Mr. Dreamer and found that Mr. Dreamer had a state felony conviction within the past fifteen years.  Id.  In the search warrant affidavit, Detective Slanina wrote that:

> Based on the information provided by the first witness in the Oxford shooting and the identification of Wakiyan with Shayna near her apartment with the shooting on this case, it is probable there are communications on Wakiyan's cell phone regarding the planning of the meeting with Shayna, as well as other interactions preceding this incident regarding the firearm incidents.

Id.

In the affidavit, Detective Slanina requested a search warrant be issued to permit a search of, "One black TLC cell phone with 'WSPS' in red writing on the back, seized from Wakiyan Dreamer's person. The Phone is currently stored at the Rapid City Evidence building. It may be removed off site for processing." (Ex. 1 at p. 2).  The search warrant affidavit requested a search of the following item(s):

> a. Live and deleted user attribution data including, but not limited to, user accounts, e-mail, accounts, passwords, PIN codes, patterns, account names, user names, screen names, remote data storage accounts, documents, files, metadata, or any other information and evidence that may demonstrate attribution to a particular user or users;
>
> b. Live and deleted records, documents, financial transaction records and other items that may constitute evidence, contraband, fruits, and/or instrumentalities of violations of crimes, including but not limited to the crime(s) listed;
>
> c. Live and deleted contact lists, call logs, text messages and multimedia messages (SMS and MMS messages), iMessages, e-mails, chats, video conference communication data, contact information, financial transactions, installed application information including content and any other information which can be used to identify potentially associated persons;

    d.  Live and deleted passwords, password files, PIN codes, encryption codes, or other information necessary to access the digital device or data stored on the digital device such as hidden file applications;

    e.  Live and deleted documents, programs, pictures, videos, audio files, text files, databases, application data, calendar entries, user dictionaries, malware, viruses, tracking or other remote monitoring software, and any associated metadata;

    f.  Live and deleted web browser history, web browser bookmarks, temporary Internet files, cookies, searched items, downloaded and uploaded files, social networking websites or applications;

    g.  Live and deleted data stored on removable media such as Subscriber Identity Modules (SIM cards), flash memory storage devices such as Secure Digital (SD) and Micro SD media cards and any associated wireless devices (Bluetooth, Wi-Fi, and other technology);

Id. at pp. 1. Additionally, the affidavit contained a temporal limitation of the search from May 4, 2025, until the warrant's execution. Id. at p. 2. Detective Slanina applied for a search warrant on May 15, 2025, and it was granted by Judge Joshua Hendrickson the same day. Id. at p. 8.

Detective Slanina testified that she was never informed that Mr. Dreamer possessed a phone during either incident. She further stated that no one advised her of any communications originating from Mr. Dreamer's cell phone. According to Detective Slanina, neither witnesses nor Shayna Long reported texting Mr. Dreamer about the shooting incidents. No individuals came forward to say that Mr. Dreamer had texted them about the events or that he had participated in any related financial transactions. Detective Slanina also confirmed that no one reported statements such as "I saw Wakiyan on Facebook with a gun" or "I saw him on Snapchat with a gun." Finally, she

testified that no social media platform provided any indication that Mr.
Dreamer possessed a weapon or had posted about either incident.

## **DISCUSSION**

### I.    **Motion to Suppress Cell Phone Evidence**

A search warrant must be supported by probable cause.  See, e.g.,
United States v. Williams, 477 F.3d 554, 557 (8th Cir. 2007).  "If an affidavit in
support of a search warrant sets forth sufficient facts to lead a prudent person
to believe that there is a fair probability that contraband or evidence of a crime
will be found in a particular place, probable cause to issue the warrant has
been established."  United States v. Grant, 490 F.3d 627, 631 (8th Cir. 2007)
(internal quotations omitted); see also Illinois v. Gates, 462 U.S. 213, 238
(1983).  To satisfy this requirement, "there must be evidence of a nexus
between the contraband and the place to be searched[.]" United States v. Tellez,
217 F.3d 547, 549–50 (8th Cir. 2000).  Whether a search warrant is supported
by probable cause is to be determined by considering the totality of the
circumstances.  Grant, 490 F.3d at p. 631.  The issuing judge's resolution of
the issue of probable cause should be paid "great deference by reviewing
courts."  Gates, 462 U.S. at p. 236 (internal quotations omitted).  Reviewing
courts examine the sufficiency of an affidavit in support of a search warrant
using "common sense" and not using a "hypertechnical" approach.  United
States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (internal quotations
omitted).

## A.      The District of Minnesota's <u>Armstrong</u> Case

Cases presenting legal questions and factual circumstances similar to Mr. Dreamer's have been addressed by the United States District Court for the District of Minnesota.  In <u>Armstrong</u>, the magistrate judge addressed whether the search warrants for Armstrong's two iPhones were supported by probable cause.  <u>United States v. Armstrong</u>, No. 21-CR-228 (DWF/ECW), 2022 WL 17417901, at *12 (D. Minn. Sept. 2, 2022), <u>report and recommendation adopted,</u> No. CR 21-228 (DWF/ECW), 2022 WL 16960633 (D. Minn. Nov. 16, 2022).  Specifically, the court addressed whether there was a sufficient nexus between the phones and the suspected firearm offenses.  <u>Id.</u>

In <u>Armstrong</u>, the affiant, Sergeant Johnson with the Minneapolis Police Department, received information from a special agent about Armstrong from a criminal informant indicating that Mr. Armstrong had a gun.  <u>Id.</u> at *3.  Armstrong previously plead guilty in 2019 to an Assault 2 shooting, was released from the Minnesota Department of Corrections, and was placed on supervised release in June of 2021.  <u>Id.</u> at *2.  Sergeant Johnson wrote a Ping warrant to include GPS information about Armstrong's location in hopes of aiding in his location and arrest.  <u>Id.</u> at *3.  On the morning of October 12, 2021, Sergeant Johnson and ATF officers gathered in the area of Armstrong's phone location outside of an apartment.  <u>Id.</u>  While officers were performing surveillance, Armstrong walked out of the apartment building and entered a vehicle.  <u>Id.</u>

As officers began moving to arrest Armstrong, he attempted to flee. Id. He crashed the vehicle and fled on foot. Id. After a short foot chase, Armstrong fell and landed on a large tuft of grass, in which a loaded Glock 26 was found. Id. Officers recovered a cell phone from a fanny pack worn by Armstrong when he was arrested, as well as a second cell phone from the vehicle he used when attempting to flee. Id. Sergeant Johnson wrote affidavits requesting permission to search the cell phones for evidence of Armstrong's weapons possessions and any other associated violence since his release on June 10, 2021. Id.

Armstrong argued that the affidavits did not establish probable cause due to an insufficient nexus. Id. at *7. The government argued that courts have upheld searches of cell phones in firearms cases because phones often contain evidence of the possession and transfer of firearms, including photographs, texts, and other documentation of the firearms' acquisition. Id. at *9. Notably, the magistrate judge in Armstrong acknowledged that the affidavits seeking to search Armstrong's cell phones "contained no such statements about firearms and photographic documentation on cell phones, nor did they explain what evidence of 'any other associated violence' Sergeant Johnson sought or why she believed such evidence would be found on the iPhones." Id.

The Armstrong magistrate judge reviewed cases that "establish more of a connection between the cell phone that was searched and the alleged criminal conduct, regardless of whether the affiant provided a 'training-and-experience'

9

statement." Id. at *10–11 (See, e.g., United States v. Ramirez, 180 F. Supp. 3d 491, 496 (W.D. Ky. 2016) (upholding the magistrate judge's recommendation that there was insufficient evidence to establish a nexus between the cell phone and the alleged crime.  In Ramirez, there was nothing in the affidavit asserting that the affiant knew Ramirez used the phone as a tool of drug trafficking.); United States v. Woods, No. 18-CR-0153 (WMW/HB), 2019 WL 337590, at *4 (D. Minn. Jan. 28, 2019) (upholding the magistrate's recommendation that the facts contained in the search warrant affidavit established a probable cause to believe that contraband or evidence of a crime would be found on Woods' cell phones.  The affidavit described investigations into numerous serious crimes, including drug dealing, unlawful possession of firearms, firearm trafficking, shootings, and murder.  The affidavit also identified specific information sought in connection with those investigations; such as documentation of narcotics dealing, location data, the source and location of firearms, and communications that could corroborate evidence relating to a contemporaneous murder.); United States v. Carter, No. CR 20-104, 2022 WL 2128509, at *4 (W.D. Pa. June 14, 2022) (finding probable cause existed to authorize the search of the Carter's cell phones because the affidavits supporting the warrants identified reasons why the affiant believed evidence of a crime may be found on the cell phones and the affiant explained his knowledge of the sort of information and files, including photos, text messages, and calls, that felons prohibited from possessing firearms may possess on their cell phones); and United States v. Griffin, No. 2:17-CR-20639-TGB-MKM, 2022

10

WL 2072042, at *2 (E.D. Mich. June 8, 2022) (holding that a magistrate judge could infer three travelers appeared to be connected to drug trafficking because courts have recognized the importance of cell phones in coordinating criminal enterprises despite little explanation how the affiant formed the belief that the defendant's cell phone contained evidence of drug and gun possession). The magistrate judge in Armstrong believed that the cases cited above established more of a connection, compared to the facts in Armstrong, between the cell phones that were searched and the alleged criminal conduct, regardless of whether affiant provided a "training-and-experience" statement. Armstrong, 2022 WL 17417901, at *11.

In Armstrong, the government cited several Eighth Circuit cases in which affirmative "training-and-experience" statements were not required to establish probable cause. Id. After reviewing these cases, the Armstrong magistrate judge found them not entirely persuasive because they involved searches of residences for evidence of drug trafficking or child pornography. Id. Additionally, the affidavits in the cases contained more statements supporting a nexus between the sought-after evidence and the location to be searched. Id. (See, e.g., United States v. Keele, 589 F.3d 940, 942–44 (8th Cir. 2009) (finding the affidavit established the required nexus between the evidence being sought in the warrant application and Keele's residence. After a car accident Keele threw a black bag into a field; agents searched the bag and found drug paraphernalia. Officers applied for warrant to search Keele's car, garage, and residence, in which they found a rifle and additional drug paraphernalia. The

11

search warrant affidavit recounted this evidence, the affiant explained that in his experience the items recovered from the black bag were "consistent with the conversion of powder cocaine into cocaine," and the affiant explained that in his experience the items found in the black bag are used by drug dealers of illicit narcotics.); United States v. Wallace, 550 F.3d 729, 731–33 (8th Cir. 2008) (finding that the affidavit to search Wallace's residence supported a finding of probable cause because the affidavit discussed an interview with a minor female in which she disclosed to law enforcement that Wallace took "dirty" pictures of her and showed her photos of another woman's "privates" on his computer in his residence); United States v. Hager, 710 F.3d 830, 827 (8th Cir. 2013) (finding that agent's affidavit established probable cause to search Hager's residence for sexually suggestive images of another suspect's minor daughters); United States v. Summage, 481 F.3d 1075, 1080 (8th Cir. 2007) (concluding that the warrant was neither over-broad nor lacking in particularity to search Summage's residence after an alleged victim, a handicapped male, told police that Summage videotaped and took photos of a woman performing oral sex on him in Summage's bedroom); and United States v. Taylor, No. CRIM. 15-91 JNE/LIB, 2015 WL 4992443, at *1 (D. Minn. Aug. 20, 2015) (adopting the magistrate judge's report and recommendation finding that the issuing judge had a substantial basis to conclude that probable cause existed to issue the search warrant of the drug trafficker's residence despite the affiant's failure to include a "training-and-experience" statement)).

The government in Armstrong cited United States v. Murphy, 69 F.3d 237 (8th Cir. 1995), to argue that Sergeant Johnson did not need to explicitly state that phones often contain evidence of their possession and transfer, including photos, texts, and other documents of a firearm because such "talismanic recitation" is not required.  Armstrong, 2022 WL 17417901, at *9. The court noted that Murphy involved the search of a home, not a cell phone, and the Supreme Court has noted that searching a cell phone would "typically expose to the government far *more* than the most exhaustive search of a house[.]"  Id. at *10 (citing Riley v. California, 573 U.S. 373, 396 (2014)).

Considering the invasive nature of the search of a cell phone, the Armstrong court found that cases addressing searches of residences for drugs and child pornography were not binding and not persuasive as to whether the affidavits established a sufficient nexus between Armstrong's iPhones and evidence that Armstrong knowingly possessed a firearm.  Id.  The Armstrong court found the affidavits did not establish a sufficient nexus between the iPhones and evidence of Armstrong possessing a firearm and "any other associated evidence."  Id.  The court also found that the affidavits did not establish probable cause and that the iPhone warrants were overbroad.  Id.

In the Armstrong case, Sergeant Johnson testified at the second suppression hearing to the information she knew but did not provide in the affidavit.  Id.  When Sergeant Johnson wrote the search warrant affidavit, she knew Armstrong was a member of the Stick Up Boys, a criminal street gang known for violent crime and weapons possession; the criminal informant had

provided information regarding Armstrong's possession of a firearm on several occasions; and in August of 2021, there were videos of Armstrong on social media talking about weapons, making firearms automatic, and participating in a shooting.  Id.  Additionally, Sergeant Johnson testified that it was "incredibly common" for gang members to have photos of themselves with guns.  Id.

Furthermore, the Armstrong court found that the warrant was "so facially deficient" that no police officer could reasonably presume the warrant to be valid.  Id. at *19. The court noted that the only evidence as to the search warrants' execution was that Sergeant Johnson took the cell phones and search warrants to the crime lab's forensic computer division and submitted them to the people trained to perform the extractions.  Id.  The court noted that there was nothing in the record establishing whether the affidavits were provided to the people who performed the extractions or whether Sergeant Johnson or someone else searched the results of the extractions.  Id.

The Armstrong court recognized that it previously recommended suppression under similar circumstances in Jackson.  Id. (citing United States v. Jackson, No. 18-CR-211 (JNE/ECW), 2019 WL 13127190, at *12 (D. Minn. Jan. 4, 2019), report and recommendation adopted, No. 18-CR-211 (JNE/ECW), 2019 WL 13127184 (D. Minn. Feb. 26, 2019) (noting that the receipt attached to the warrant indicated the affiant collected the cell phone "to be examined at a later date" but there was no evidence as to who actually searched the cell phone and whether that person had the application as well as the warrant or otherwise understood the intended scope of the search).  The

14

Armstrong court found that there was nothing in the record establishing whether the affidavits were provided to the people who did the extractions or whether Sergeant Johnson or some other person searched the results of the extractions (and what they searched for).  Id.  The court recommended that Leon[4] did not apply to the iPhone warrants insofar as they were insufficiently particular and overbroad, and recommended suppression of the evidence obtained from the iPhone warrants.  Id.

The Honorable District Court Judge Donovan W. Frank adopted the magistrate judge's Report and Recommendation.  United States v. Armstrong, No. CR 21-228 (DWF/ECW), 2022 WL 16960633, at *3 (D. Minn. Nov. 16, 2022).  In particular, the Judge Donovan found that the Leon exception did not apply because the government did not provide any evidence of who conducted the search of the iPhones and what information they used.  Id. at *2.  Therefore, the district court found it could not access whether the searching officer's reliance on the warrant was reasonable.  Id.  While the government argued that the Armstrong magistrate judge should have asked more questions during the evidentiary hearing, District Court Judge Frank asserted that the burden is on the government, not the magistrate judge, to prove the good-faith exception applies.  Id.

---

[4] United States v. Leon, 468 U.S. 897 (1984).

**B.      The District of Minnesota's <u>Cole</u> Case**

<u>Cole</u> is also a case out of the United States District Court for the District of Minnesota that addresses whether a search warrant affidavit established a nexus between the alleged activity and the cell phone to be searched.  <u>United States v. Cole</u>, No. 23-CR-175 (DWF/DJF), 2023 WL 9547891, at *8 (D. Minn. Oct. 25, 2023), <u>report and recommendation adopted,</u> No. CR 23-175 (DWF/DJF), 2024 WL 35471 (D. Minn. Jan. 3, 2024).  The <u>Cole</u> case began after a confidential informant told police that a man named Cole was selling heroin from a house on Oday Street in Maplewood, Minnesota.  <u>Id.</u> at *1.  Officers confirmed the information through surveillance and other confidential reliable sources.  <u>Id.</u> at *2.  They watched the residence for several months, noting suspicious activity, including a stolen minivan leaving the property with fentanyl, loose pills, and a loaded firearm inside.  <u>Id.</u> at *1–2.  Law enforcement later conducted a controlled drug buy using another reliable informant.  <u>Id.</u> at *6.  Based on these observations and tips, police obtained a search warrant for the Oday Street house, executed it, and found fentanyl and documents with Cole's name.  <u>Id.</u> at *2.

Cole was not at the Oday Street residence during the search, but law enforcement located Cole's location based off cell phone pings obtained through a separate search warrant.  <u>Id.</u> at *2.  Law enforcement drove to the neighborhood where Cole was believed to be located and identified a vehicle registered to Cole.  <u>Id.</u> at *2–3.  Based on photos from Cole's social media accounts, a law enforcement officer identified Cole as the individual in the

driver's seat of the parked vehicle. Id. at *3. Officers followed and arrested him after a "felony stop." Id. During an inventory search of Cole's vehicle, officers found a respirator mask, fentanyl debris, two cell phones, and a duffel bag containing marijuana and fentanyl. Id. The day after Mr. Cole's arrest, Police Officer Toupal applied for a warrant to search the two cell phones seized from the car during the inventory search. Id. at *3. Cole moved to suppress cell phone evidence, arguing the cell phone search warrants lacked probable cause, particularity, and were overbroad. Id. at *1.

Officer Toupal noted in the affidavit that law enforcement observed Mr. Cole talking on a cell phone while driving shortly before he was arrested. Id. at *4. Officer Toupal stated the following in the affidavit:

> In this investigation, your affiant believes COLE is actively involved in the illegal possession and sales of narcotics. Your affiant believes that there is a high likelihood the cell phone seized during the above events will contain evidence to support this investigation and will show knowledge of various illegal narcotics and firearm related offenses. It is also very likely that the seized cell phone will help identify further sources /co-conspirators of Narcotics related activity that will further this and other investigations.

Id. Officer Toupal did not testify at the suppression hearing. Id. Additionally, there was no evidence before the court of who executed the cell phone warrant, whether they read the warrant of the affidavit, or how they executed the warrant. Id.

Since the government represented that it did not intend to offer the cell phone evidence in its case-in-chief at trial, the magistrate found the motion to suppress the cell phone evidence was moot. Id. at *1. However, the parties disputed whether evidence obtained from the cell phones could be used in the

government's rebuttal or for impeachment of witnesses other than Mr. Cole. Id. The magistrate recommended granting Cole's motion to suppress cell phone evidence to the extent that it challenged the government's use of evidence in rebuttal or to impeach third-party witnesses. Id. at * 10.

The court found no nexus between the phones and any criminal activity. The affidavit lacked any specific facts connecting the phones to drug trafficking, firearms, or gang activity. The court noted that Officer Toupal wrote that there was a "high likelihood" that the phone would contain evidence showing knowledge of various illegal narcotics and firearms offenses. Id. at *9. However, the court recognized that the affidavit did not explain why Officer Toupal held that belief. Id. For example, the affidavit did not allege that the call Mr. Cole made just before his arrest was related to illegal activity, that Mr. Cole used a cell phone to arrange narcotics transactions, or that a search of his social media accounts revealed any connection between his phone use and drugs, firearms, or other illegal activity. Id. Additionally, Officer Toupal did not include a statement that in his "training-and-experience," drug traffickers possess firearms, participate in gangs, or use their cell phone as tools of the trade. Id.

The magistrate in Cole found that the Leon good faith exception did not apply because the affidavit was "so lacking in indicia of probable cause" that reliance on it was unreasonable. Id. at * 10. The court reasoned that there was no allegation in the cell phone warrants to suggest Mr. Cole had any involvement whatsoever in illicit firearms or gang activity. Id. The court

18

recognized that Officer Toupal did not testify at the hearing and the court was not provided information regarding who executed the cell phone warrants, whether they received and read the warrants, whether the affidavits were attached to the warrants, or what they knew about Mr. Cole's case to support probable cause for the search.  Id. (citing United States v. Jackson, 2019 WL 13127190 at *12).  The Honorable District Court Judge Donovan W. Frank adopted the magistrate's report and recommendation.  United States v. Cole, No. CR 23-175 (DWF/DJF), 2024 WL 35471, at *2 (D. Minn. Jan. 3, 2024).

### C. The Cell Phone Search Warrant Affidavit Did Not Establish Probable Cause to Believe the Cell Phone Would Contain Evidence of Dreamer's Firearm Possession

Mr. Dreamer argues that law enforcement violated his Constitutional rights by "requesting a warrant for his phone without suspicion or nexus that evidence of the crimes he is charged with would be located on his phone." (Doc. 31 at p. 1).  Additionally, Dreamer argues there was nothing more than "a guess on the part of law enforcement that some sort of contraband, mainly relating to the Oxford Apartments shooting, would be found on Mr. Dreamer's phone."  Id.  According to Mr. Dreamer, no interviewee or other evidence indicated that he was using his phone to communicate about the shootings. Id.  The government argues that the "affidavit demonstrated there was a 'fair probability' that evidence of Defendant's discharges and possession of a firearm would be found on his cell phone."  (Doc. 34 at p. 6).

Law enforcement officers must present sufficient information to the judge so that the judge can make an informed and independent determination of

probable cause.  Franks v. Delaware, 438 U.S. 154, 165 (1978).  As an initial matter, "probable cause is determined based on the information before the issuing judicial officer."  United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (internal quotation marks omitted).  The Eighth Circuit has recognized that the "Fourth Amendment's guarantee against unreasonable searches extends to data on a person's private cellular telephone."  United States v. Suellentrop, 953 F.3d 1047, 1049 (8th Cir. 2020) (citing Riley, 573 U.S. at 386).  Additionally, the Eighth Circuit has recognized the Supreme Court's view that "[c]ell phones differ in both a quantitative and a qualitative sense from other objects" because of the volume of personal information they store.  Robbins v. City of Des Moines, 984 F.3d 673, 681 (8th Cir. 2021) (citing Riley, 573 U.S. at 393).

Here, the government cites no case, finding probable cause based on an inference that a cell phone, belonging to and kept near a person who is prohibited from possessing a firearm, is likely to contain photos or messages evidencing that person's unlawful possession of a firearm.  See Armstrong, 2022 WL 17417901, at *10.  Mr. Dreamer argues that "there is nothing more than a guess on part of law enforcement that some sort of contraband, mainly relating to the Oxford shooting, would be found on Mr. Dreamer's phone." (Doc. 31 at p. 3).  Additionally, Mr. Dreamer contends there was no evidence or interview to indicate he used his phone to communicate about the Oxford Apartments shooting or that he used his phone during the May 13 shooting at the Corner Pantry.  Id.  Furthermore, in the instant case no one came to law

enforcement saying that Mr. Dreamer texted them about the Oxford Apartments or the Corner Pantry shootings.  Finally, nobody informed law enforcement that Mr. Dreamer had been involved in financial transactions regarding either incident.

In the instant case, <u>Armstrong</u>, and <u>Cole</u>, all three defendants were charged with firearm or drug related offenses and filed motions to suppress evidence obtained from their phone(s).  (Doc. 30); <u>Armstrong</u>, 2022 WL 17417901, at *1; <u>Cole</u>, 2023 WL 9547891, at *1.  In all three cases, the affiants did not explain why evidence of firearm or drug possession would likely be found on the defendants' phone(s) through photos, messages, or social media posts.  <u>Armstrong</u>, 2022 WL 17417901, at *9; <u>Cole</u>, 2023 WL 9547891, at *3–4, *8.  Additionally, in all three cases, none of the affiants provided a "training-and-experience" statement in the search warrant affidavits.  <u>Armstrong</u>, 2022 WL 16960633, at *2; <u>Cole</u>, 2023 WL 9547891, at *9.

In <u>Armstrong</u>, the government argued that courts have upheld searches of cell phones in firearm cases since phones often contain evidence of firearm possession through photographs, texts, and other documentation.  <u>Armstrong</u>, 2022 WL 17417901, at *9 (citing <u>Woods</u>, 2019 WL 337590, at *4).  However, the <u>Armstrong</u> court noted that in <u>Woods</u>, the affiant included a "training-and-experience" statement and the mere fact that Armstrong possessed the iPhones when he was arrested was not enough to establish a nexus.  <u>Armstrong</u>, 2022 WL 17417901, at *9.  This court agrees and finds that the mere fact that Mr. Dreamer, a former violent offender, was arrested with a cell phone is not

enough to establish a nexus between Mr. Dreamer's phone and the alleged crime.

This court reaches the same conclusion as the <u>Armstrong</u> court that the Eighth Circuit cases involving searches of residences are neither binding nor persuasive on the question of whether the affidavit to search Mr. Dreamer's cell phone established a sufficient nexus between the phone and evidence that he knowingly possessed a firearm and ammunition. <u>Armstrong</u>, 2022 WL 17417901, at *12 (citing <u>Keele</u>, 589 F.3d at pp. 942–44; <u>Wallace</u>, 550 F.3d at pp. 731–33; <u>Hager</u>, 710 F.3d at 827; <u>Summage</u>, 481 F.3d at p. 1080; <u>Taylor</u>, 2015 WL 4992443, at *1; <u>Murphy</u>, 69 F.3d at pp. 240–41). Additionally, the Eighth Circuit has observed that the Supreme Court has emphasized that "'[c]ell phones differ in both a quantitative and a qualitative sense from other objects' due to the volume of personal information they store". <u>Robbins</u>, 984 F.3d at 681 (citing <u>Riley</u>, 573 U.S. at 393). The affidavit in this case does not contain any statements that Mr. Dreamer posted photos of himself with a firearm on social media, sent photos of himself with a firearm to any other person, used a cell phone to obtain a firearm, communicated to anyone about firearms using cell phones or social media, or engaged in any kind of coordination activity with another person relating to firearms.

Moreover, this court also agrees with the <u>Armstrong</u> court that cases such as <u>Ramirez</u>, <u>Woods</u>, and <u>Carter</u> "establish more of a connection between the cell phone that was searched and the alleged criminal conduct, regardless of whether the affiant provided a 'training-and-experience' statement." <u>Id.</u> at

22

*10–11.  For example, even though the affiant in <u>Ramirez</u> wrote, "Affiant knows through training and field experience that individuals may keep text messages or other electronic information stored in their cell phones which may relate them to the crime and/or co-defendants/victim," the court found "insufficient information to establish probable cause within the four corners of the affidavit to issue the search warrant." <u>Ramirez</u>, 180 F. Supp. 3d at pp. 493, 496.  The <u>Ramirez</u> court found the affidavit insufficient because there was nothing in the affidavit asserting that the affiant knew Ramirez used the phone as a tool of drug trafficking.  <u>Id.</u> at p. 496.  In the instant case, Detective Slanina did not provide a "training-and-experience" statement explaining why Mr. Dreamer may have photos, videos, text, financial information, and social media posts about the firearm offense on his cell phone nor did she assert Mr. Dreamer used his cell phone at the shooting incidents.  Detective Slanina failed to explain why it was probable that Mr. Dreamer had communications on his cell phone regarding a plan to meet Shayna Long.

Detective Slanina wrote in the affidavit that based on the information provided by the witness at the Oxford Apartments shooting and the identification of Mr. Dreamer and Shayna Long at the Corner Pantry shooting, it was probable that Mr. Dreamer's cell phone contained communications to meet with Shayna Long.  (Ex. 1 at p. 4).  Additionally, Detective Slanina also asserts that it was probable other interactions preceding the shootings would be found on the cell phone.  <u>Id.</u>  Detective Slanina does not state that, based on her "training and experience," individuals involved in gun crimes typically keep

related evidence on their phones.  She likewise does not explain why she believes Mr. Dreamer would communicate with Shayna Long about a plan to meet.  Detective Slanina does not reference any observed phone use, communications about the weapon, or other facts tying the cell phone to the specific firearm offense.

At the suppression hearing, Detective Slanina admitted she was not told that Mr. Dreamer had a phone on him during either shooting.  Detective Slanina testified it was not reasonable to assume that everybody has evidence of crimes in their phone all the time.  Detective Slanina told the court that Shayna Long did not indicate to law enforcement that she had been texting with Mr. Dreamer about either incident.  Furthermore, Detective Slanina testified that no one had come forward to tell law enforcement that Mr. Dreamer had texted them about either incidents or that they had seen him on Facebook, Snapchat, or any other social media platform indicating he had a weapon or was posting about either incident.  Finally, Detective Slanina testified that no one came forward to law enforcement saying that Mr. Dreamer had been involved in financial transactions regarding either shooting incident.

Unlike in the instant case, in Armstrong and Cole, the defendants were in possession of a firearm or drugs when they were arrested.  Armstrong, 2022 WL 17417901, at *3; Cole, 2023 WL 9547891, at *3.  In Armstrong, after a brief foot chase with police, Armstrong fell onto a large tuft of grass in which police found a loaded Glock 26.  Armstrong, 2022 WL 17417901, at *3.  Police recovered a cell phone in a fanny pack worn by Armstrong, as well as a second

cell phone in the vehicle Armstrong used to attempt to flee.  Id.  In Cole, law

enforcement conducted a felony traffic stop, arrested Cole, and found two cell

phones, fentanyl, and marijuana during the vehicle inventory search.  Cole,

2023 WL 9547891, at *3.  Here, Mr. Dreamer was arrested, and upon

searching Mr. Dreamer, officers recovered a cell phone.  Mr. Dreamer was not

in possession of a firearm at the time of his arrest.  Officer Dadah admitted to

the court that Mr. Dreamer was not actively committing a crime when Mr.

Dreamer was arrested.  Officer Dadah testified that other officers he was

patrolling with were notified by detectives that there was probable cause to

arrest Mr. Dreamer.

　　The affidavits in Armstrong and Cole contained additional statements

that established probable cause compared to the affidavit in the instant case.

Specifically, in Cole, the affidavit described the various items and drugs found

during Cole's arrest.  Cole, 2023 WL 9547891, at *3.  Law enforcement found a

scale in Cole's pocket with white residue on it.  Id.  The duffel bag in Cole's car

contained dozens of empty plastic baggies, and a variety of substances that

either presumptively tested positive or otherwise appeared to be narcotics,

including fentanyl, methamphetamine, heroin, and psychedelic mushrooms.

Id.  Officers observed Cole talking on a cell phone while driving shortly before

he was arrested.  Id. at *4.

　　The investigation into Mr. Dreamer was significantly shorter and less

comprehensive than the investigations conducted in Cole and Armstrong.

Here, the Oxford Apartments and the Corner Pantry shootings were the only

two events, which were within a two-day timeframe, that were included in the affidavit.  (Ex. 1 at p. 3).  Comparatively, in <u>Cole</u> law enforcement surveyed Cole's residence from June 2022 until they executed a search warrant on the residence in March 2023.  <u>Cole</u>, 2023 WL 9547891, at *1–2.  During the eight months of surveillance, law enforcement observed and learned of multiple events linking Cole to the distribution of illegal narcotics.  <u>Id.</u>  In <u>Armstrong</u>, a criminal informant told law enforcement that Armstrong had a gun and provided law enforcement with a phone number for Armstrong.  <u>Armstrong</u>, 2022 WL 17417901, at *3.  Officers used this information to obtain a ping warrant.  <u>Id.</u>  When police attempted to arrest Armstrong, he tried to flee and once arrested, a gun and two cell phones were recovered.  <u>Id.</u>

In the instant case, officers located and seized a cell phone from Mr. Dreamer during the search incident to his arrest.  The arresting officer admitted that Mr. Dreamer was not committing a crime when he was arrested and that officers arrested him because they were told by detectives that there was probable cause to arrest Mr. Dreamer.

For the reasons discussed above, this court recommends suppressing the evidence obtained from Mr. Dreamer's cell phone because there is insufficient evidence to establish probable cause within the four corners of the affidavit to issue the search warrant.

### D. The Leon Good Faith Exception Does Not Apply

The government asserts that the <u>Leon</u> good faith exception applies here even if the warrant is overbroad, because law enforcement relied on the warrant in good faith.  (Doc. 34 at p. 7–8).  The government argues that the "items searched for were typical items to be found on the phones, such as chats and photographs."  <u>Id.</u> at p. 8.  The government points out that the temporal limitation on the search warrant was for evidence from May 4, 2025, until the date of the execution.  <u>Id.</u>  Mr. Dreamer makes no attempt to argue that any of the four circumstances apply to this case.  However, the government bears the burden of proving the exception.  <u>Armstrong,</u> 2022 WL 16960633, at *2 (D. Minn. Nov. 16, 2022) (citing <u>United States v. Riesselman</u>, 646 F.3d 1072, 1080 (8th Cir. 2011), for the proposition that once the defendant comes forward with specific evidence demonstrating taint, the government has the ultimate burden of persuasion to show the evidence is not tainted).

Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant or the search warrant is overbroad, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith. <u>United States v. Ross</u>, 487 F.3d 1120, 1122–23 (8th Cir. 2007) (describing <u>Leon</u> good-faith exception and citing <u>Leon</u>, 468 U.S. at 921); <u>see</u> <u>also</u> <u>United States v. Lopez-Zuniga</u>, 909 F.3d 906, 909 (8th Cir. 2018); <u>United States v. Stelten</u>, 867 F.2d 446. 451 (8th Cir. 1989).

27

"When assessing the good faith of the officers, [the court] look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007). Courts can look outside of the four corners of the affidavit and consider the totality of the circumstances, including what the officer knew but did not include in the affidavit. United States v. Farlee, 757 F.3d 810, 819 (8th Cir. 2014). The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization. United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008).

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included. Leon, 468 U.S. at 923 (citations omitted); Ross, 487 F.3d at 1122.

During the suppression hearing, defense counsel asked the following questions to Detective Slanina regarding probable cause to search Mr. Dreamer's cell phone:

**Defense Counsel**: So you didn't have any specific information that Mr. Dreamer had used his phone to talk about, photograph, or engage in other communication about either incident; is that fair?

**Detective Slanina**: I would say that a reasonable person would believe that they could have their –

**Defense Counsel**: I'm not asking you about a reasonable person, Detective.

**Detective Slanina**: Okay

**Defense Counsel**: I am asking if you had any specific information.

**Detective Slanina**: I was not told specifically that he had a phone on him, no.

**Defense Counsel**: And were you told that there were any communications sent from that phone?

**Detective Slanina**: No.

**Defense Counsel**: So are you telling the Court it's reasonable to assume that everybody has evidence of crimes in their phone all the time?

**Detective Slanina**: No.

**Defense Counsel**: Just Mr. Dreamer?

**Detective Slanina**: No.

**Defense Counsel**: Okay. Is that based on your training and experience, ma'am?

**Detective Slanina**: My training and experience, that it's reasonable to believe that someone had a cell phone on them, yes.

The government did not ask Detective Slanina to explain why it was probable that Mr. Dreamer had communications on his phone about meeting up with Shayna Long. Additionally, the government did not ask Detective Slanina to explain why it was probable other interactions preceding the firearm incidents would be on his cell phone.

At the suppression hearing, Detective Slanina testified the following regarding obtaining the search warrant with Judge Hendrickson:

**United States Attorney**: When you reached out—well, let me ask you this: Did you reach out to Josh Hendrickson, the judge, regarding the search warrant?

**Detective Slanina**: I did, yes.

**United States Attorney**: Can you describe how this process works?

**Detective Slanina**: So, generally, depending on the time of day, or the day itself, you can either use what we have the on-call judge schedule, or if it's during the day, you are able to walk over to the courthouse and attempt to make contact. Just based on the time of day, knowing court schedules, and whatnot, I chose to use the on-call schedule. So generally I will make sure that I have my search warrant prepared in a PDF form. I then create an email. Make the phone call to the judge. They're sworn in—you're sworn in over the phone. I then send the search warrant. If there's any sort of issues, questions, any additional information they require, they'll call you back. If not, they'll generally sign it and email it back.
**United States Attorney**: And so here did you call Judge Hendrickson?
**Detective Slanina**: I did.
**United States Attorney**: And did you let him know that you were sending the search warrant?
**Detective Slanina**: I did.
**United States Attorney**: And were there any other communications after that?
**Detective Slanina**: There was not.
**United States Attorney**: Did he just send it back signed?
**Detective Slanina**: He did.
**United States Attorney**: So did he consider anything outside the scope of the search warrant?
**Detective Slanina**: Not to my knowledge, no.

Detective Slanina provided no information in the search warrant affidavit as to who was to execute the warrant. Additionally, during the suppression hearing, the government did not ask Detective Slanina to explain who executed the warrant, if the affidavit was provided to the person who did the extractions, or whether Detective Slanina or someone else searched the results of the extractions.

This court will now review if the <u>Leon</u> good-faith exception applies. First, this court will address whether the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Here, Detective Slanina extensively explained her training, education, professional background, and her experience investigating numerous crimes. (Ex. 1 at p.

3).  Detective Slanina wrote in the search warrant affidavit and testified that she was able to identify Mr. Dreamer as the shooter at the Corner Panty based on the Corner Pantry's video footage, previous booking records, and multiple matching facial tattoos.  Id.  Additionally, the witness who resided at the Oxford Apartments told law enforcement the long-haired man left in a gold Buick vehicle.  Id.  Detective Slanina reviewed RCPD records and found that Mr. Dreamer had previously been involved in a traffic stop while driving a gold Buick LeSabre. Id.  Additionally, at both scenes, officers found 9mm shell casings.  Id.  However, no evidence was offered to explain why there was probable cause to search the cell phone.

In the affidavit, Detective Slanina indicated that the witness's information about the Oxford Apartments shooting, together with the subsequent identification of Mr. Dreamer and Shayna Long near her apartment by the Corner Pantry, supported a probability that Mr. Dreamer's cell phone contained communications regarding the planning of a meeting with Shayna Long.  Id.  Nevertheless, Detective Slanina fails to offer any evidence suggesting that Mr. Dreamer used a cell phone to communicate about the firearm or that he took photos or videos of the firearm with his cell phone.  There is nothing in the record indicating anyone saw Mr. Dreamer use a cell phone at either shooting incident.  Additionally, there is nothing in the record suggesting anyone informed law enforcement that he texted them about either incident or uploaded photos on social media with a gun.

In Armstrong, the court held that warrant was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" due to the information provided by the affiant at the suppression hearing that was not provided in the search warrant affidavit. Armstrong, 2022 WL 17417901, at *18.  The affiant in Armstrong testified that Armstrong had been a member of a criminal street gang known for violent crime and weapons possessions; there were videos of Armstrong on social media talking about making firearms automatic and participating in a shooting; and the criminal informants had provided information regarding Armstrong's possession of a firearm on several occasions.  Id.  Here, Detective Slanina did not provide new facts during the suppression hearing to explain why it was probable that conversations with Shayna Long would be on Dr. Dreamer's cell phone.  Specifically, Detective Slanina testified that she was not told that Mr. Dreamer had a phone during either incident. Detective Slanina admitted that she was not told any communication was sent from Mr. Dreamer's phone.  Detective Slanina testified that based on her training and experience, it was reasonable to believe that someone [Mr. Dreamer] had a cell phone on them.

Additionally, Chad Sayles,[5] a detective with the RCPD, who is involved in the investigation of Mr. Dreamer also testified at the suppression hearing. Detective Sayles explained that during the investigation he obtained law enforcement records from the RCPD "where the shooting occurred," search

---

[5] Detective Sayles testified at the evidentiary hearing and the court finds his testimony credible.

warrants, "phone dumps," law enforcement reports, and detective reports. Detective Sayles' testimony does not help support the government's argument that the <u>Leon</u> exception should apply. The information Detective Sayles testified to are reports and information acquired after the search warrant was obtained. Detective Sayles did not testify to any information known to the officers that was not included in the affidavit; rather, his testimony pertained to evidence obtained after the search warrant was acquired.

Next, when the Assistant United States Attorney inquired whether, based on Sayles' experience as a law enforcement officer, it is widely understood that phones can be used to obtain GPS location data, Detective Sayles confirmed that it is. Section (e) of the search warrant and search warrant affidavit states: "Live and deleted documents, programs, pictures, videos, audio files, text files, databases, application data, calendar entries, user dictionaries, malware, viruses, tracking or other remote monitoring software, and any associated metadata[.]" Detective Slanina testified that remote monitoring software "could be things like GPS." Notably, this testimony does not explain why it was probable that Mr. Dreamer would have had conversations on his cell phone with Shayna Long. Detective Sayles' and Slanina's testimony regarding GPS information requested in the search warrant does not provide any information as to what detectives knew but did not include in the affidavit regarding the probable cause to search Mr. Dreamer's cell phone. Therefore, based on the evidence presented to this court, the search warrant affidavit was "so lacking in

33

indicia of probable cause as to render official belief in its existence entirely unreasonable."

Second, there is no evidence that the issuing judge "wholly abandoned her judicial role" when issuing the warrant. Here, Detective Slanina testified that she used the on-call judge schedule to obtain the search warrant. Detective Slanina prepared the search warrant in a PDF form and called Judge Hendrickson, the on-call judge that day. Once Detective Slanina was sworn-in over the phone by Judge Hendrickson she emailed Judge Hendrickson the search warrant and search warrant affidavit. Judge Hendrickson emailed the search warrant back with his signature. Detective Slanina testified, that to her knowledge, Judge Hendrickson did not consider anything outside the scope of the search warrant. Detective Slanina also indicated that using an on-call judge to obtain a search warrant was a normal procedure. Therefore, this court finds that there is no evidence the issuing judge "wholly abandoned his judicial role" when issuing the warrant.

Third, this court now turns to the issue of whether the search warrant is so facially deficient that no police officer could reasonably presume it to be valid. "[I]n assessing whether reliance on a search warrant was objectively reasonable under the totality of the circumstances, it is appropriate to take into account the knowledge that an officer in the searching officer's position would have possessed." United States v. Curry, 911 F.2d 72, 78 (8th Cir. 1990). In this case, the sole information presented to the court regarding execution of the search warrant is that it was directed "TO ANY LAW ENFORCEMENT OFFICER

34

IN THE COUNTY OF PENNINGTON."  Additionally, Section (i) of the search warrant states that "The executing law enforcement officer(s) may need to enlist the aid of a specialized computer forensic laboratory . . ."  Other than these statements, no further details were provided about the warrant's execution. There is nothing in the record establishing whether the affidavit was provided to the people who did the extractions or whether Detective Slanina or some other person searched the results of the extractions.  During the suppression hearing, no information was provided to the court as to who performed the execution of the search warrant and whether they were provided with the affidavit.

The magistrate judge in <u>Armstrong</u> noted that it had previously recommended suppression under identical circumstances.  <u>Armstrong</u>, 2022 WL 17417901, at *19 (citing <u>Jackson</u>, 2019 WL 13127190, at *12 (recommending the suppression of the results of the cell phone search.  There was no evidence as to who searched the cell phone and whether that person had the application as well as the warrant or otherwise understood the intended scope of the search.  Given the warrant's breadth and the lack of evidence about whether the application was attached, who executed the search, or what the officer knew, the court could not conclude that the <u>Leon</u> exception applied. The District Court upheld the suppression of the evidence obtained as a result of the search warrant of Jackson's cell phone.  <u>United States v. Jackson</u>, No. 18-CR-211 (JNE/ECW), 2019 WL 13127184, at *2 (D. Minn. Feb. 26, 2019)).  In <u>Armstrong</u>, the District Court adopted the magistrate

judge's recommendation that the <u>Leon</u> exception did not apply because the government did not provide any evidence of who conducted the search of the iPhones and what information they had at the time.  <u>Armstrong</u>, 2022 WL 16960633, at *2.  Thus, the District Court stated that it could not assess whether the searching officer's reliance on the warrant was reasonable.  <u>Id.</u> Additionally, the <u>Armstrong</u> District Court noted that the burden is on the government, not the magistrate judge, to prove that the good-faith exception applies.  <u>Id.</u>

Here, nothing on the record establishes that the search warrant affidavit was provided to the people who performed the cell phone extraction or whether Detective Slanina or Detective Sayles searched the results of the extractions. Additionally, the holdings in <u>Armstrong</u> and <u>Jackson</u> lead this court to recommend that the search warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid."  Without more information, this court cannot access whether the searching officer's reliance on the warrant was reasonable.

Unlike the courts in <u>Jackson</u> and <u>Armstrong</u>, this court was not asked to determine if the search warrant was overbroad.  <u>Jackson</u>, 2019 WL 13127190, at *9; <u>Armstrong</u>, 2022 WL 17417901, at *12.  Since the defendant did not challenge the search warrant as overbroad, this Court does not address that issue.  Nevertheless, this court finds that the warrant was "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid" and "so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable," based on the facts discussed above. Additionally, even though Armstrong and Jackson are not binding cases on this court, the cases are persuasive and arise out of the Eighth Circuit. Furthermore, the Honorable Judge Karen Schreier, a District Court Judge for the District of South Dakota, cited Jackson and Armstrong in a case involving the suppression of evidence obtained from a search of Apple and iCloud Accounts.  United States v. Rondeau, No. 4:23-CR-40004-KES, 2024 WL 4765007, at *5 (D.S.D. Nov. 13, 2024).

Fourth and finally, this court turns to whether the "issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included."  Detective Slanina testified that she was sworn in by Judge Hendrickson over the phone and she emailed him the search warrant. Detective Slanina also testified that, to her knowledge, Judge Hendrickson did not consider anything outside the scope of the search warrant.  No information was presented to suggest that the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included.

Based on the evidence presented and the current record, this court recommends that the Leon exception does not apply to the cell phone warrant insofar as it lacks an indicia of probable cause and that the search warrant is so facially deficient that no police officer could reasonably presume them to be valid.

## CONCLUSION

For the foregoing reasons, it is respectfully recommended that the Motion to Suppress (Doc. 30) be granted.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 21st day of November, 2025.

BY THE COURT:

DANETA WOLLMANN
United States Magistrate Judge